# UNITED STATES DISTRICT COURT

for the

Middle District of Tennessee

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. **19-MJ-2241** |
| INFORMATION ASSOCIATED WITH nfl_worm THAT IS STORED AT PREMISES CONTROLLED BY INSTAGRAM, LLC | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 846 | Possession with intent to distribute controlled substances and Conspiracy to possess with intent to distribute controlled substances |
| 18 USC 1956, 1957 | Money Laundering |

The application is based on these facts:
See attached statement.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA TFO Michael Galluzzi
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____09/26/2019_____

_____
*Judge's signature*

City and state: Nashville, TN

Hon. Jeffery S. Frensley, Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

IN RE SEARCH OF:                          )        **UNDER SEAL**
                                          )
INFORMATION ASSOCIATED WITH               )
nfl_worm THAT IS STORED AT                )        Case No. _____
PREMISES CONTROLLED BY                    )
INSTAGRAM, LLC                            )

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Galluzzi, a Task Force Officer with the Drug Enforcement Administration,

being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.      I make this affidavit in support of an application for a search warrant for

information associated with nfl_worm (the "**Subject Account**") that is stored at premises owned,

maintained, controlled, or operated by Instagram, LLC, ("Instagram") a social-networking

company owned by Facebook, Inc. and headquartered in San Francisco, California. The

information to be searched is described in the following paragraphs and in Attachment A. This

affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),

(b)(1)(A), and (c)(1)(A), to require Instagram to disclose to the government records and other

information in its possession, including the contents of communications, pertaining to the

subscriber or customer associated with the **Subject Account**.

2.      I am a Task Force Officer (TFO) of the Drug Enforcement Administration (DEA).

As such, I am an "investigative or law enforcement officer" of the United States within the

meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by

law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516(1) and Tennessee State Law.

3.    I have been a Task Force Officer with the DEA since April 30, 2019, and I am presently assigned to the Nashville Resident Office.   I am also employed by the State of Tennessee Office of the Inspector General ("Tennessee OIG") and have been so employed since October 2014.   I have been assigned to the TENNCARE Fraud Division for the past approximately four and a half years. I have participated in investigations regarding fraudulent claims to TENNCARE.

4.    Prior to my employment at Tennessee OIG, I was employed by the Metro of Nashville Police Department ("MNPD") for 17 years.   For 12 years while at MNPD, I was assigned as a detective in the narcotics division. During my time at MNPD I worked with DEA, and participated in numerous narcotics investigations, involving Title III wire investigations, executing search warrants, and narcotics and money recovery. I participated in investigations involving unlawful importation and exportation of controlled substances, the possession with the intent to distribute controlled substances, the distribution of controlled substances, the use of communication facilities to further these offenses, as well as the related laundering of monetary instruments.

5.    I have participated in all aspects of drug investigations, including the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, the use of court-ordered intercepts of electronic communications, investigative interviews, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and electronically recorded conversations.  I have spoken on

2

numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers and distributors.

6.      The facts in this affidavit come from my personal knowledge, my training and experience, and information obtained from other agents, witnesses, and agencies. Unless otherwise indicated, all statements related herein are related in substance and in part, and are not verbatim. I have not set forth each and every fact learned during the course of this investigation.

7.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

8.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) (Unlawful Possession with Intent to Distribute) have been committed by **Marquel PEOPLES aka Worm**. There is also probable cause to search the **Subject Account** for information described in Attachment A for evidence of these crimes and items to be seized listed in Attachment B.

## JURISDICTION

9.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### Probable Cause

6.      This application is submitted in connection with a DEA investigation of controlled substances trafficking offenses. In August 2019, the Drug Enforcement

3

Administration (DEA) Nashville District Office Tactical Diversion Squad began assisting the Tennessee Bureau of Investigation (TBI), the LaVergne Police Department (LPD) and the Metro Nashville Police Department (MNPD) (hereafter all departments involved referred to "Investigators") in investigating **Marquel PEOPLES aka "Worm"** and **Christopher JOHNSON** regarding possible violations of Title 21, United States Code, Sections 841(a)(1) 846, and 843(b) in the Middle District of Tennessee. During this investigation, investigators have utilized a variety of investigative techniques including, but not limited to debriefings of confidential sources, confidential informants, undercover officers, controlled purchases from targets, surveillance operations, and recorded conversations between confidential sources/undercover officers to targets,.

7.    During the course of this investigation, DEA Agents have identified a network of drug traffickers in the Middle District of Tennessee responsible for the distribution of significant amounts of heroin. I believe that **Marquel PEOPLES aka "Worm"** and **Christopher JOHNSON** are heroin distributors in the Nashville, Tennessee, area.

### MNPD Traffic Stop and Identification of "Worm"

8.    On August 6, 2019, members of the Metro Nashville Police Department (MNPD) Hermitage CSU were conducting surveillance in the parking lot of the Food Lion, located at 3636 Bell Rd., Hermitage, Tennessee. They observed behavior between the occupants of two vehicles that was consistent with what they believed to be a drug transaction. A Nissan Rogue pulled up next to a dark grey Dodge Charger, and a passenger from the Rogue got into the charger. A short time later that individual exited the charger, returned to the Rogue, and the Rogue departed the area. MNPD conducted a traffic stop on the Rogue and recovered approximately one gram of suspected blue heroin from the passenger. The passenger confirmed

he/she purchased the heroin from the individual in the charger, who the passenger knew as "Worm". The passenger provided telephone number (707) 273-8926 as being "Worm's" telephone number.

9.  Based in part on the information learned the prior day, as well as information from public databases, and information from other law enforcement agencies, MNPD investigators positively identified Worm to be **Marquel PEOPLES**. On August 7, 2019, MNPD investigators applied for and were granted a Tennessee State search warrant to obtain location data on (707) 273-8926.

### Interview of Cooperating Defendant (CD-1)

10. On August 15, 2019, LaVergne Police Department arrested an individual on charges related to heroin trafficking. At the residence where the individual was arrested, investigators seized blue, pink, gray and brown powder. The Tennessee Bureau of Investigation's drug lab conducted a preliminary analysis of the blue substance and determined it to contain heroin. In an effort to gain favorable consideration on these pending drug related charges, the individual, hereinafter referred to as Cooperating Defendant or CD-1, agreed to cooperate with law enforcement.

11. On August 20, 2019, LPD Detective John Krauss, TBI ASAC Dennis Mabry and Murfreesboro Police Department (MPD) Detective Merrill Beene went to the Rutherford County jail to interview CD-1. At the outset of the interview, CD-1 was advised of his/her *Miranda* rights, which CD-1 waived. During the course of the interview, CD-1 told investigators he/she bought the blue heroin from two brothers in the Antioch, Tennessee area. CD-1 knew one brother as "Worm." As discussed above, Investigators have previously identified "Worm" as **Marquel PEOPLES**. Investigators have identified **Christopher JOHNSON** as **PEOPLES**'s

brother. CD-1 told law enforcement that "Worm's" telephone number was in CD-1's phone. Pursuant to a Rutherford County, Tennessee state search warrant for the contents of CD-1's telephone, investigators found the name "Worm" with the telephone number (707) 273-8926 listed in the contact list of CD-1's telephone. According to CD-1, **PEOPLES** sold the blue heroin for $3,200-$3,600 for fifty grams, which **PEOPLES** classified as two ounces (technically, two ounces should be 56 grams). CD-1 described the blue heroin as being very strong. The first time CD-1 used the blue heroin he/she overdosed. According to CD-1, **PEOPLES** also sold brown/gray heroin for $1600 per 25 gram ounce (technically, one ounce should be 28 grams).

12.    At a second interview, which took place on August 21, 2019 at the Rutherford County jail, CD-1 identified a Tennessee driver's license photograph of **Marquel PEOPLES** as "Worm." CD-1 estimated he/she had purchased a total of three to six kilograms of heroin from **PEOPLES** in the past six months.

### CS-1 Purchase of Blue Heroin on August 26, 2019

13.    On August 26, 2019, utilizing a confidential informant (CS-1), LPD, TBI and MPD made a controlled phone call to the (707) 273-8926 in order to arrange the purchase of approximately seven grams of blue heroin from **PEOPLES**. CS-1 is cooperating with law enforcement on behalf of CD-1 in hopes that CD-1 will receive lenient treatment for pending/potential drug charges. Following the recorded phone call, CS-1 told investigators the person on the phone sounded like **PEOPLES**'s partner. CS-1 did not know his name or any nicknames, but stated the partner rode with **PEOPLES** and assisted **PEOPLES** in distributing heroin. Investigators believe this person to be Christopher **JOHNSON**. CS-1 and **JOHNSON** set the deal to occur in the same place where they had met on previous purchases, the Dollar General Market at 5445 Nolensville Road, Nashville, Tennessee. Prior to and after the controlled buy,

law enforcement searched CS-1 and the vehicle driven by CS-1, with negative results. CS-1 was given $600 in prerecorded U.S. Currency to purchase seven grams of the blue heroin. CS-1 was provided with monitoring equipment that enabled law enforcement to listen to the controlled buy as it occurred.

14.     CS-1 arrived at the Dollar General and backed into a parking spot.  Shortly thereafter, a white Nissan Altima with Virginia license plate UAZ-4007 ("the Nissan Altima") arrived in the parking lot of the Dollar General.  On June 1, 2019, Brentwood Police Department conducted a traffic stop on a Nissan Altima, with license plate 4M93P0.  **PEOPLES** was driving the car and Jasmine Preston, a woman believed to be **PEOPLES's** girlfriend, was the passenger. Investigators believe the license plate that belongs on the Nissan Altima is actually Tennessee 4M93P0, which is registered to Christopher **JOHNSON**.

15.     Investigations observed a black male driving the Nissan Altima, who they were later able to positively identify as **JOHNSON**.  He backed into a parking space. Approximately one minute later, investigators observed CS-1 throw the pre-recorded U.S. Currency out of the passenger window into the driver's side window of the Nissan Altima. Investigators then observed **JOHNSON** throw a package into the passenger's side of CS-1's vehicle. When investigators met up with CS-1 following the controlled buy, CS-1 turned over a package containing a blue substance, believed to be heroin. CS-1 stated the person who sold him/her the heroin was **PEOPLES**'s partner.  As described below, CS-1 later identified a Tennessee driver's license photograph of **JOHNSON** as the person who sold the seven grams to him/her. Lab results are pending on this evidence.

### CS-1 Purchase of Evidence on August 29, 2019

16.     On August 29, 2019, LPD, TBI, MPD and the DEA, met with CS-1 for the

7

purpose of making another controlled purchase of blue heroin from **PEOPLES** and/or **JOHNSON**. CS-1 positively identified a Tennessee Driver's License photo of **JOHNSON** as the person CS-1 purchased blue heroin from on August 26, 2019. CS-1 made a controlled phone call to the for the purpose of setting up a second controlled purchase of blue colored heroin.

17.     Once the (707) 273-8926 was answered, CS-1 confirmed to investigators it was **PEOPLES** talking on the phone. During the course of this conversation, a detective operating in the undercover capacity (UC), got on the phone and spoke with **PEOPLES**. During this conversation, the UC talked with **PEOPLES** about increasing the quantity of heroin CS-1 was going to purchase that night from one ounce for $2,500 to two ounces for $5,000. The UC said he/she wanted the blue heroin and **PEOPLES** said "we started the blue…" and later stated "if you got the blue stuff, [CI-1] got it from us." The UC then gave the phone back to CS-1, who set the deal up to take place at McDonalds, located at 5800 Old Hickory Blvd., Hermitage, Tennessee. Law enforcement searched CS-1 and the vehicle driven by CS-1 with negative results. CS-1 was given $5,000 in prerecorded U.S. Currency to purchase two ounces of blue heroin from **PEOPLES**. CS-1 was provided with monitoring equipment that enabled law enforcement to listen to the controlled buy as it occurred.

18.     CS-1 went to the McDonalds. A short time later, surveillance units observed the Charger arrive at the McDonalds. CS-1 then received a call from (707) 273-8926 and recognized the voice on the phone to be that of **PEOPLES**. **PEOPLES** told CS-1 to pull out and go to the stop sign. CS-1 pulled onto Sells Dr., Hermitage, Tennessee, and pulled up to the stop sign. The Charger pulled up next to CS-1's vehicle and stopped. Law enforcement observed CS-1 pass items through CS-1's vehicle's window to the Charger, and the driver of the Charger pass CS-1 a bag.

8

19.     After the deal was complete, investigators retrieved a baggie containing blue suspected heroin from CS-1. CS-1 told investigators it was too dark to identify who was in the Charger. Investigators weighed the blue suspected and determined it was not two ounces, but approximately 51 grams. Investigators instructed CS-1 to contact **PEOPLES** on the (707) 273-8926 to discuss the shortage. **PEOPLES** answered the (707) 273-8926 and stated all two ounces was there, it was just packed tightly. CS-1 ended the call.  At the direction of the investigators, CS-1 called the (707) 273-8926 again to ask **PEOPLES** if CS-1 could give **PEOPLES**'s telephone number, the (707) 273-8926, to the UC so the UC could order heroin directly from **PEOPLES**. **PEOPLES** agreed. Lab results are pending on this evidence.

### UC Purchase of Evidence on September 5, 2019

20.     On September 5, 2019, the UC placed a call to the (707) 273-8926 for the purpose of setting up the purchase of four ounces of blue heroin. **PEOPLES** answered the phone and set the deal to occur at the TA Truck Stop at exit 62 off of Interstate 24. **PEOPLES** agreed to sell the UC four ounces of blue heroin for $10,000.

21.     The UC arrived in the parking lot of the truck stop and called **PEOPLES** on the (707) 273-8926. **PEOPLES** stated he was almost to the location. A short time later, **PEOPLES** contacted the UC and moved the meet location to the Subway/Citgo station located at 13001 Old Hickory Blvd., Antioch, Tennessee. Shortly after the UC arrived at Subway, law enforcement observed the Charger pull into the parking lot and go behind the building near the diesel pumps and stop. **PEOPLES** then called the UC and told the UC to follow him (the Charger) and the Charger left the parking lot. **PEOPLES** then turned right on Firestone Parkway and right on Gould Boulevard, which is a dead end street.

22.     The UC pulled up to the driver's side of the Charger and handed **PEOPLES** a

plastic bag containing $10,000 in prerecorded U.S. Currency. **PEOPLES** rolled up the window and the UC could see **JOHNSON**, sitting in the passenger seat, counting the money. While **JOHNSON** was counting the money, **PEOPLES** again rolled down the window and showed the UC a bag containing the blue heroin. **PEOPLES** advised the UC that **JOHNSON** was counting the money and rolled the window back up. **PEOPLES** rolled the window back down and advised the UC the money was $200 short. The UC denied being short and told **PEOPLES** to count it again. **PEOPLES** said he would count it later and handed the UC the plastic bag containing the blue suspected heroin. Following the deal, investigators recounted the copied money and discovered it was, in fact, $40 short. The UC made a controlled phone call to **PEOPLES** on the (707) 273-8926 and explained the shortage and said he/she would make it up to **PEOPLES** on the next deal. The blue suspected heroin was taken to LaVergne Police Department and put into evidence. Lab results are pending on this evidence.

### Surveillance of JOHNSON and PEOPLES on September 13, 2019

23.     On September 13, 2019, MNPD investigators were conducting surveillance on 3868 Central Pike, Apartment 224, Hermitage, Tennessee. They observed **JOHNSON** exit apartment 224, carrying a backpack. Investigators observed **JOHNSON** put a back pack in the Charger and get into the driver's seat. Surveillance followed the Charger to the Dollar General Market at 5445 Nolensville Pike, Nashville, Tennessee, where it backed into a parking spot. Investigators observed approximately six or seven separate vehicles pull up next to the Charger, one after the next, and make contact with **JOHNSON**. On at least two occasions, investigators witnessed money being thrown into the Charger and then an item being thrown into the vehicle from where the money had come. Those vehicles then immediately left the parking lot.

24.     One of the vehicles that met with **JOHNSON** was a blue Nissan Sentra, which

entered the parking lot and pulled up to the Charger. The Charger, driven by **JOHNSON**, then pulled out of the parking lot, followed by the Sentra. Both vehicles traveled to the Lowes, located at 5520 Nolensville Pike, Nashville, Tennessee, where they pulled up driver's side window to driver's side window. Investigators observed items exchanged between the two vehicles. After the exchange, both vehicles departed the parking lot, going in opposite directions.

25.     Investigators followed the Sentra to a parking lot located at 1307 Bell Road, Nashville, Tennessee, where it parked in a remote part of the lot with no cars around it. Investigators pulled up next to the vehicle and in plain view on center console investigators saw a piece of paper with a blue powder substance on top of it. Investigators made contact with occupant of the vehicle, who admitted the blue powder was heroin. The suspected heroin was seized by MNPD and taken to the property room.

26.     After the Charger met with the Sentra, other investigators maintained surveillance of the Charger and observed it back into a parking spot near the Regions Bank, located at 15580 Old Hickory Blvd., Nashville, Tennessee. **PEOPLES**, who was driving a Mercedes SUV (the "Mercedes SUV"), with temporary Tennessee license plate Q19BFA6, was already backed into a parking space one space away from where **JOHNSON** parked the Charger. Investigators watched as **JOHNSON** and **PEOPLES** talked, and at one point, **JOHNSON** took photographs of **PEOPLES** standing outside the Mercedes holding what appeared to be a liquor bottle. Surveillance units followed **PEOPLES** in the area of Old Hickory Blvd and Edmonson Pike, near Old Franklin Road and Preston Rd, where surveillance units lost sight of the Mercedes.

### Surveillance on September 18, 2019

27.     On or about August 27, 2019, law enforcement was granted authority to track the Target Vehicle pursuant to a state warrant.  On September 12, 2019, United States Magistrate

Judge Jeffery S. Frensley authorized law enforcement to monitor the location data of a telephone believed to be used be **PEOPLES.**

28. On the morning of September 18, 2019, MNPD investigators began conducting surveillance at 828 Irma Drive, Nashville, Tennessee because tracker information on the Target Vehicle showed it was parked there overnight. In addition, the location data for **PEOPLES**'s cellular telephone showed it to be in that same area over night. At approximately 9:15am, Investigators observed **PEOPLES** exit 828 Irma Drive and get into the Target Vehicle, which was parked in the driveway of 828 Irma Drive. **PEOPLES** appeared to have retrieved something from the car and went back into 828 Irma Drive. Approximately three or four minutes later, **PEOPLES** again exited the residence, got into the Target Vehicle and drove away from 828 Irma Drive. **PEOPLES** traveled to the end of the street and stopped the car in the middle of the road for approximately one minute. **PEOPLES** then turned the Target Vehicle around and went back to 828 Irma Drive. **PEOPLES** went inside 828 Irma Drive for approximately three or four minutes and then came back outside, got back into the Target Vehicle, and departed 828 Irma Drive. Investigators followed **PEOPLES** to the Food Lion, located at 936 Richards Road, Nashville, Tennessee, where investigators watched and recorded three separate vehicles pull up to **PEOPLES** in the Target Vehicle and conduct apparent drug transactions. Investigators could see the customer, park next to the Target Vehicle, throw money into the Target Vehicle's window and a few moments later, **PEOPLES** threw an item into the customer's window. This behavior is consistent with previous controlled buys made from **PEOPLES** and **JOHNSON**, as well as what investigators have observed with other customers during the course of this investigation. These three transactions took approximately four minutes to complete. **PEOPLES** then left the Food Lion, and according to the tracker on the Target Vehicle, traveled back to 828

Irma Drive.

<u>**Surveillance on September 19 and 20, 2019**</u>

29.     In the morning hours on September 19, 2019, based on the location data of the phone believed to be used by **PEOPLES**, investigators conducted surveillance in the area of 4630 Robin Lane, Nolensville, Tennessee.  Location data showed **PEOPLES** to be within 18 meters of this location during the night of September 18, 2019 into the morning of September 19, 2019. Upon arriving at the residence, investigators observed the Mercedes SUV (the same vehicle that **PEOPLES** has been observed driving on multiple occasions, as recently as September 13, 2019).  While conducting surveillance, investigators observed Jasmine Preston, the girlfriend of **PEOPLES**, get in the Mercedes SUV and depart the 4630 Robin Lane, Nolensville, Tennessee and subsequently return to the 4630 Robin Lane, Nolensville, Tennessee.

30.     On September 20, 2019, while conducting surveillance of the **Target Premises**, investigators observed the Nissan Altima, with Virginia license plate USZ-4007, parked at the **Target Premises** (the same Altima that was used during the controlled purchase made on August 26, 2019).  Investigators observed Jasmine Preston come out of the house with children, who all got the in the Nissan Altima and departed the **Target Premises**.

31.     On September 20, 2019, the UC made a controlled call to **PEOPLES** at (707) 273-8926 to discuss a drug transaction.  No one answered this phone, but within a few minutes, **PEOPLES** called the UC back from a telephone **PEOPLES** described as his "new phone".  Based on location information on (707) 273-8926, investigators believe that phone is located at 3868 Central Pike, Apt 224, Hermitage, Tennessee, where **JOHNSON** is known to stay.  During the course of the call, the UC and **PEOPLES** discussed the potential sale to the UC of a significant quantity of heroin.  The UC asked **PEOPLES** if he (**PEOPLES**) was still able to do

13

that narcotics transaction that day. **PEOPLES** said he was ready. The UC suggested meeting at the Citgo gas station, the same location as the previous deal. **PEOPLES** said that was fine and for the UC to call **PEOPLES** when he was close to the meet location. The UC agreed. A few minutes after this call, investigators observed **PEOPLES** and Preston exit the 4630 Robin Lane, Nolensville, Tennessee, get into the Nissan Altima and depart the residence. Law enforcement conducting surveillance observed **PEOPLES** carrying a silver briefcase.

### Arrest of PEOPLES and JOHNSON

32.     On September 24, 2019, **PEOPLES** and **JOHNSON** turned themselves into the Rutherford County jail pursuant to warrants for Conspiracy to Distribute Schedule I drugs.

### Information about Drug Trafficking and Money Laundering

33.     Based upon my training and experience, I know that persons who are involved in the possession and distribution of controlled substances, and who conspire to do so, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, often also commit money laundering offenses, in violation of Title 18, U.S.C., Sections 1956 and 1957.

### Identification of Subject Account

34.     During the course of this investigation, MNPD investigators identified the **Subject Account**, nfl_worm, as being used by **Marquel PEOPLES**. Investigators, using an undercover Instagram account, became friends with **PEOPLES** and were able to follow his posts on the **Subject Account**. During the week of August 26, 2019, MNPD investigators viewed an Instagram Live video from the Subject Account were **PEOPLES** stated he had been laying low because there were "people dying". On approximately September 5, 2019, shortly after the controlled purchase referenced above, **PEOPLES** posted an Instagram Live video on the **Subject Account** showing a large amount of currency and referencing having "twenty racks."

Based on my training and experience, I believe "racks" is commonly used as slang for $1,000 quantities of money. In this particular case, **PEOPLES** was referencing having $20,000. The UC had just paid **PEOPLES** $9,960 for approximately four ounces of blue heroin.

35. Also, based on pictures from the **Subject Account**, investigators were able to identify a residence where **PEOPLES** had been living between September 2018 and September 2019. Based on public database searches on **PEOPLES**, investigators learned **PEOPLES** was associated with 5000 Burke Trail, Nolensville, Tennessee. A search of publicly available information from the website Zillow revealed this house to be a rental property and provided a series of pictures of the interior of the house. MNPD detectives were able to compare photos posted to the **Subject Account** of **PEOPLES** standing in front of very distinct tiles in what appears to be a kitchen, with photos from Zillow of the same distinct tile, to confirm this to be one and the same residence.

36. From my review of publicly available information provided by Instagram about its service, including Instagram's "Privacy Policy," I am aware of the following about Instagram and about the information collected and retained by Instagram.

37. Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com. Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information. Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

38. Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services,

including Flickr, Facebook, and Twitter. When posting or sharing a photo on Instagram, a user can add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a user made add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo); location information; and other information. A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos. In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram. Users can also "like" photos.

39. Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

40. Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. Instagram collects and maintains this information.

41. Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

42. Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is,

16

stop following them or block the, which prevents the blocked user from following that user.

43.     Instagram allow users to post and share various types of user content, including photos, videos, captions, comments, and other materials.  Instagram collects and maintains user content that users post to Instagram or share through Instagram.

44.     Instagram users may send photos and videos to select individuals or groups via Instagram Direct.  Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

45.     Users on Instagram may also search Instagram for other users or particular types of photos or other content.

46.     For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app.  Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

47.     Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram.  For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

48.     Instagram also collects information on the particular devices used to access Instagram.  In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access

Instagram.

49.     Instagram also collects other data associated with user content.  For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

50.     Instagram also may communicate with the user, by email or otherwise.  Instagram collects and maintains copies of communications between Instagram and the user.

51.     On September 6, 2019, pursuant to 18 U.S.C. § 2703(f), a preservation request was served on Instagram requiring Instagram to preserve all information associated with the **Subject Account**.

52.     As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram account at a relevant time.  Further, Instagram account activity can show how and when the account was accessed or used.  For example, as described herein, Instagram logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining

18

the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to the crime under investigation. Additionally, Instagram builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner. Last, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation. For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

53. Based on the information above, the computers of Instagram are likely to contain all the material described above with respect to the **Subject Account**, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

## Information To Be Searched And Things To Be Seized

52. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular Title 18, United States Code, Sections 2703(a), (b)(1)(A), and (c)(1)(A), by using the warrant to require Instagram to disclose to the government copies of the records and

other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## Conclusion

53.    Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of Title 21, United States Code, Sections 841(a)(1) 846, and 843(b), and Title 18, United States Code, Sections 1956 and 1957 may be located in the **Subject Account** described in Attachment A.

54.    Based on the forgoing, I request that the Court issue the proposed search warrant.

55.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Instagram. Because the warrant will be served on Instagram, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Instagram profile with username:

nfl_worm

that is stored at premises owned, maintained, controlled, or operated by Instagram, LLC, a

company that is owned by Facebook, Inc. and headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

### I.  Information to be disclosed by Instagram, LLC

To the extent that the information described in Attachment A is within the possession, custody, or control of Instagram, LLC, including any messages, records, files, logs, or information that have been deleted but are still available to Instagram, LLC, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Instagram, LLC is required to disclose the following information to the government for each account listed in Attachment A:

a.  All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

b.  All past and current usernames associated with the account;

c.  The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d.  All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

e.  All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

f.  All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

g.  All communications or other messages sent or received by the account **January 1, 2019 to September 24, 2019**;

h.  All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content account **January 1, 2019 to September 24, 2019**;

i.  All photographs and images in the user gallery for the account account **January 1, 2019 to September 24, 2019**;

j.  All location data associated with the account, including geotags account **January 1, 2019 to September 24, 2019**;

k.    All data and information that has been deleted by the user account **January 1, 2019 to September 24, 2019**;

l.    A list of all of the people that the user follows on Instagram and all people who are following the user (*i.e.*, the user's "following" list and "followers" list), as well as any friends of the user;

m.    A list of all users that the account has "unfollowed" or blocked;

n.    All privacy and account settings;

o.    All records of Instagram searches performed by the account, including all past searches saved by the account **January 1, 2019 to September 24, 2019**;

p.    All information about connections between the account and third-party websites and applications; and,

q.    All records pertaining to communications between Instagram, LLC and any person regarding the user or the user's Instagram account, including contacts with support services, and all records of actions taken, including suspensions of the account.

Instagram is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) 846, and 843(b), and Title 18, United States Code, Sections 1956 and 1957 involving **Marquel PEOPLES aka "Worm"** and **Christopher JOHNSON** since August 1, 2019, including, for each username identified on Attachment A, information pertaining to the following matters:

(a) the sale of illegal drugs; communications between **Marquel PEOPLES aka "Worm"** and **Christopher JOHNSON** and other co-conspirators; money laundering; and preparatory steps taken in furtherance of the scheme.

(b) Evidence indicating how and when the Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and

2

events relating to the crime under investigation and to the Instagram account owner;

(c) Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to violations of Title 21, United States Code, Sections 841(a)(1) 846, and 843(b), and Title 18, United States Code, Sections 1956 and 1957, including records that help reveal their whereabouts.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct. I am employed by Instagram, LLC, and my title is

_____. I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved. I state

that the records attached hereto are true duplicates of the original records in the custody of

Instagram, LLC. The attached records consist of _____ **[GENERALLY**

**DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of Instagram, LLC, and they were made by Instagram, LLC as a regular

practice; and

b.      such records were generated by Instagram, LLC's electronic process or system

that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of Instagram, LLC in a manner to ensure that they are true duplicates of the

original records; and

4

2.     the process or system is regularly verified by Instagram, LLC, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                Signature